**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Clarissa Sabedra,

      Plaintiff,

v.

Kyle Jacob Snider, et al.,

      Defendants.

No. CV-25-01889-PHX-DWL

**ORDER**

In June 2024, Clarissa Sabedra ("Plaintiff") was arrested following an encounter with Officers Kyle Snider and Nicholas Gastelum (together, the "Defendant Officers") of the Phoenix Police Department. In this action, Plaintiff asserts excessive force and unlawful seizure claims under 42 U.S.C. § 1983 against the Defendant Officers and a municipal liability claim against the City of Phoenix ("the City") pursuant to *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978).[1]

Now pending before the Court is Defendants' motion to dismiss. (Doc. 17.) For the reasons that follow, the motion is granted in part and denied in part.

**BACKGROUND**

I.    <u>Factual Allegations</u>

The factual allegations set forth below are derived from the operative pleading, the Second Amended Complaint ("SAC"). (Doc. 15.)

---

[1]    This order will collectively refer to Officer Snider, Officer Gastelum, and the City as "Defendants."

A.    **The Encounter**

On June 1, 2024, "temperatures in the City of Phoenix reached a high of 107 degrees Fahrenheit." (*Id.* ¶ 14.)[2] "June 2024 was the hottest June on record." (*Id.*) The SAC alleges that "[i]t is well-known by the City of Phoenix that, when temperatures reach such extreme heat, surface temperatures of pavement in the City of Phoenix can reach as high as 180 degrees Fahrenheit." (*Id.* ¶ 15.)

That day, "[a]t approximately 1:00 p.m.," "Officers Snider and Gastelum arrived at the residence of a neighborhood in connection with, 'a verbal argument.'" (*Id.* ¶ 16.)[3] "When Officers Snider and Gastelum arrived at the residence, there was no ongoing disturbance" and "the temperature was approximately one hundred degrees Fahrenheit." (*Id.* ¶¶ 17-18.)

"After approaching the house, Officer Gastelum encountered Plaintiff, who was not engaged in any disruptive behavior." (*Id.* ¶ 19.) "Officer Gastelum asked Plaintiff to go with him and Plaintiff willingly complied by walking outside the house and accompanying Officer Gastelum." (*Id.* ¶ 20.) "Officer Gastelum asked Plaintiff several questions and Plaintiff remained cooperative during the questioning." (*Id.* ¶ 21.)

"As Officer Gastelum was questioning Plaintiff, Officer Snider concurrently had remained at the house and had caused a disturbance after forcefully grabbing and arresting an innocent woman who had recently arrived at the residence." (*Id.* ¶ 22.) "The innocent woman had repeatedly cried to Officer Snider, 'I just got here.'" (*Id.* ¶ 23.)

"When Officer Gastelum realized Officer Snider was arresting the innocent woman, he drew his attention to that arrest and rushed back to the residence to assist in arresting

[2]    The "Factual Allegations" section of the SAC includes several footnotes citing what appear to be the exhibits attached to the SAC. The exhibits consist of newspaper articles and a weather forecast detailing the weather in Phoenix (Doc. 15-1 to 15-6), a newspaper article titled "Phoenix police held man on hot asphalt for nearly 6 minutes before he died, video shows" (Doc. 15-7), court documents from the City of Phoenix Municipal Court concerning a lawsuit in which Plaintiff was a defendant (Doc. 15-8), and a screenshot of a video on Fox 10 Phoenix captioned "Phoenix PD faces new lawsuit from burn incident" (Doc. 15-9). The Court has omitted the SAC's footnotes when citing the exhibits throughout this section.

[3]    The SAC cites "Phx. Police Dep't Incident Report No. 202400000801664" but does not provide the cited police report or any information as to what is contained within.

the innocent woman." (*Id.* ¶ 24.)

"After Officer Gastelum escorted the arrested innocent woman to his vehicle, Officer Snider turned his attention to Plaintiff, who was sitting in a chair and had loudly vocalized to Officer Snider that they had wrongfully arrested an innocent woman." (*Id.* ¶ 25.)

"Officer Snider told Plaintiff to sit down." (*Id.* ¶ 26.) "Plaintiff eventually sat down in a chair located inside a shaded porch." (*Id.* ¶ 27.)

"Officer Gastelum then returned to the house and, as Plaintiff was sitting down in the shaded porch and not posing a danger to anyone, Officer Gastelum forcefully and unnecessarily grabbed Plaintiff's left arm and pulled her to the ground." (*Id.* ¶ 28.) "Officer Snider simultaneously grabbed Plaintiff's right arm and, similarly, forcefully and unnecessarily pulled her to the ground." (*Id.* ¶ 29.)

"Plaintiff let her body go limp." (*Id.* ¶ 30.) "Officers Snider and Gastelum then dragged Plaintiff's body to the hot concrete, even though Plaintiff was wearing shorts." (*Id.* ¶ 31.) "Several bystanders gasped and yelled at Officers Snider and Gastelum, 'what is wrong with you guys?'" (*Id.* ¶ 32.)

"Plaintiff did not demonstrate or use any force and instead just cried, 'I am trying to talk to you guys,' as Officers Snider and Gastelum continued to drag Plaintiff's body across the hot concrete." (*Id.* ¶ 33.) "As Plaintiff let her body go limp, Officers Snider and Gastelum tackled Plaintiff to the ground and Officer Snider got on top of Plaintiff." (*Id.* ¶ 34.)

"Officer Snider then pressed his body onto Plaintiff, whose skin was continuing to burn against the hot concrete." (*Id.* ¶ 35.) "At one point, Officer Snider can be seen pressing his knee into Plaintiff's leg, which caused Plaintiff's leg to more forcefully press into the hot concrete and caused Plaintiff's leg to burn with more intensity." (*Id.* ¶ 36.)

"Video footage of the incident shows Plaintiff screaming in pain." (*Id.* ¶ 37.) "One bystander told Officers Snider and Gastelum, 'look at her legs, you are burning her legs.'" (*Id.* ¶ 38.) "Another bystander screams at the officers, 'why are you burning her legs?'"

(*Id.* ¶ 39.)

"Officers Snider and Gastelum burned Plaintiff's body against the hot concrete for approximately two minutes, before finally placing Plaintiff in handcuffs and allowing her to stand up." (*Id.* ¶ 40.) "Plaintiff is approximately a five-feet, six-inches, tall woman." (*Id.* ¶ 41.) "By contrast, Officers Snider and Gastelum are significantly larger and heavier than Plaintiff." (*Id.* ¶ 42.)

"Because the incident burned off several parts of Plaintiff's skin, Plaintiff had to seek emergency care the following day." (*Id.* ¶ 43.) "Specifically, Plaintiff suffered several injuries across her body and legs, including a full thickness burn on her right lower extremity, full thickness burns on multiple sites of her right lower extremity, full thickness contact burns, burn wound cellulitis, and acute pain." (*Id.* ¶ 44.) "Plaintiff's burns were so severe that she had to be admitted to the burn unit of Valleywise Health, where she underwent a 'debridement of the right lower extremity.'" (*Id.* ¶ 45.)

### B.    Other Encounters

"The incident with [Plaintiff] on June 1, 2024, was not the first time Phoenix police officers caused severe burns to individuals by holding them on the scalding hot pavement during extreme summer heat." (*Id.* ¶ 46.)

#### 1.    August 20, 2019 Encounter

On August 20, 2019, "Phoenix was in the midst of an historic heat wave. That day, the mid-day temperature soared to approximately 113 degrees, breaking a 33-year-old record." (*Id.* ¶ 47.) "In light of the record heat, the National Weather Service issued an Excessive Heat Warning that day, cautioning individuals in Phoenix to avoid outdoor activities—and identifying most of the City as facing a level of heat that was 'rare, dangerous, and deadly.'" (*Id.* ¶ 48.)

"After completing her school day at South Pointe High School, a teenager named Roniah Trotter got into a verbal—and then physical altercation—with a classmate at South Phoenix bus stop." (*Id.* ¶ 49.) "[T]he altercation was short and mostly harmless . . . and the fight ended without anyone being seriously physically injured." (*Id.* ¶ 50.)

- 4 -

"When Phoenix Police officers arrived, the two girls were already separated and remained so as police completed witness interviews." (*Id.* ¶ 52.) "After concluding the interviews, an officer grabbed Roniah from behind. Roniah, who is approximately 5 feet, 4 inches tall and weighs about 130 pounds, was confused and agitated by the unexpected physical force and instinctually recoiled when the officer grabbed her." (*Id.* ¶ 53.) "The officers then put Roniah onto the concrete, pinned her face-down, and held her there." (*Id.* ¶ 54.)

"As a result of the officers' conduct, Roniah suffered second-degree burns to her arms and filed a lawsuit against the City of Phoenix." (*Id.* ¶ 55.) "That the officers grabbed Roniah, put her on the ground, and held her there until she suffered second-degree burns was never in dispute in that lawsuit—in which the [the City] was named and served." (*Id.* ¶ 56.)

### 2. August 4, 2020 Encounter

On August 4, 2020, "at approximately 10:30 a.m., when the temperature was approximately 100 degrees, Phoenix Police chased and tackled 28-year-old Ramon Lopez after he stole a drink from a convenience store." (*Id.* ¶ 57.)

"The officers pressed Mr. Lopez against the pavement and handcuffed him, ultimately leaving him there for approximately six minutes." (*Id.* ¶ 58.) "Eventually, police picked up Mr. Lopez's motionless body and moved it into a police vehicle." (*Id.* ¶ 59.) "Mr. Lopez was later pronounced dead." (*Id.* ¶ 60.)

### 3. Additional Encounters

The SAC alleges that "[u]pon information and belief, Roniah Trotter and Ramon Lopez are not the only two people to be pressed against hot concrete by Phoenix Police officers and seriously injured." (*Id.* ¶ 61.) The SAC further alleges that "[u]pon information and belief, despite being on actual notice of Roniah Trotter's and Ramon Lopez's cases, the City of Phoenix did not make any effort to create a policy against pressing and holding individuals on concrete or asphalt on exceptionally hot days." (*Id.* ¶ 62.)

C.     **The Claims**

In Count One of the SAC, Plaintiff asserts a claim under 42 U.S.C. § 1983 against the Defendant Officers for "depriv[ing] Plaintiff of her civil rights, privileges, and immunities secured by the Fourth Amendment to the United States Constitution." (*Id.* ¶ 64.) Specifically, the SAC alleges that the Defendant Officers both (1) "[n]eedlessly and unreasonably subject[ed] Plaintiff to excessive and unreasonable physical force in effecting a seizure," and (2) "[u]nlawfully seiz[ed], detain[ed] and arrest[ed] Plaintiff without her consent thereby wrongfully imprisoning her." (*Id.*)

In Count Two of the SAC, Plaintiff asserts *Monell* claims against the City "regarding unconstitutional policies, customs, and failure to train and supervise." (*Id.* at 8.) Specifically, the SAC alleges three separate theories of *Monell* liability: 1) "Lack of Official Policy" (*id.* ¶¶ 74-85); 2) "Failure to Train/Discipline" (*id.* ¶¶ 86-93); and 3) "Widespread Unconstitutional Custom or Usage" (*id.* ¶¶ 94-108).

II.    Procedural Background

On May 30, 2025, Plaintiff initiated this action. (Doc. 1.)

On August 4, 2025, Plaintiff filed the first amended complaint ("FAC"). (Doc. 7.)

On October 1, 2025, Plaintiff filed the SAC. (Doc. 15.)

On October 16, 2025, Defendants filed the pending motion to dismiss. (Doc. 17.)[4] The motion is now fully briefed (Docs. 24, 29)[5] and neither side requested oral argument.

**DISCUSSION**

I.     Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re*

---

[4]    That same day, Defendants filed a motion for leave to file non-electronic exhibits. (Doc. 18.) The Court granted the motion (Doc. 19) and Defendants then submitted "Exhibit A: Body Worn Camera Video of Officer Nicholas Gastelum" and "Exhibit B: Body Worn Camera Video of Kyle Snider" (Doc. 21). The Court addresses these exhibits below.

[5]    On November 6, 2025, Plaintiff filed a motion for leave to file a non-electronic exhibit. (Doc. 25.) The Court granted the motion (Doc. 26) and Plaintiff then submitted "Exhibit 1: Officer Kyle Snider's Second Body Worn Camera" (Doc. 28). The Court addresses this exhibit below.

*Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.     Evidentiary Submissions Beyond The Pleadings

A threshold issue is whether the Court may consider the body-worn camera ("BWC") footage provided by Defendants and the additional BWC footage and transcripts provided by Plaintiff. The evidentiary submissions at issue are: (1) Defendants' Exhibit A "Body-Worn Camera Officer Nicholas Gastelum (Submitted Non-Electronically)" ("Officer Gastelum's BWC") (Doc. 17-1 at 1); (2) Defendants' Exhibit B "Body-Worn Camera Officer Kyle Snider (Submitted Non-Electronically)" ("Officer Snider's BWC") (Doc. 17-2 at 1); (3) Plaintiff's Exhibit 1 "Body-Worn Camera #1345 Officer Kyle Snider (Submitted Non-Electronically)" ("Officer Snider's Second BWC") (Doc. 24-1); (4) Plaintiff's Exhibit 2 "Transcript of [Officer Gastelum's BWC]" (Doc. 24-2); and (5) Plaintiff's Exhibit 3 "Transcript of [Officer Snider's BWC]" (Doc. 24-3).

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). For materials incorporated by

- 7 -

reference, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448 (citation omitted).

A.    **The Parties' Arguments**

Defendants argue that they "may incorporate a document if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim." (Doc. 17 at 4, cleaned up.)  Defendants argue that the SAC "relies extensively on the [BWC] footage of responding officers" because the SAC "quotes the conversation between Officers and individuals at the scene"; "states at one point, 'Officer Snider can be *seen* pressing his knee into Plaintiff"; and "states that 'video footage of the incident shows Plaintiff screaming in pain." (*Id.* at 5, citations omitted.)

In response, Plaintiff does not dispute Defendants' incorporation-by-reference arguments.  To the contrary, Plaintiff argues that "[w]here video evidence is available in an excessive-use-of-force case, courts should view the facts in the light depicted by the video evidence" and that "[c]ourts must draw all reasonable inferences from the video evidence in the nonmovant's favor." (Doc. 24 at 1 n.1.)  Plaintiff also attaches the three exhibits outlined above to her response.  Finally, Plaintiff's response contains a factual allegations section in which she exclusively cites Officer Gastelum's BWC, Officer Snider's BWC, and Officer Snider's Second BWC. (Doc. 24 at 1-5.)

In reply, Defendants reiterate their argument that the Court "may rely on [BWC] video." (Doc. 29 at 1.)  Nor do Defendants appear to object to Plaintiff's submissions— instead, Defendants emphasize that "Plaintiff does not contest the authenticity of either video" and that "Plaintiff's response in opposition to Defendants' Motion to Dismiss includes both the videos and their transcripts as exhibits." (*Id.* at 1-2.)

B.    **Analysis**

Under the circumstances, the Court is satisfied that it may consider the BWC footage submitted by both sides when reviewing the sufficiency of the SAC.  Perhaps most

important, neither side objects to the BWC footage proffered by the other side. *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. . . . In short: Courts are essentially passive instruments of government. They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties.") (cleaned up).

Consideration of the BWC footage is also permissible on the merits. For the incorporation-by-reference doctrine to apply, the SAC must refer to the materials at issue. *Marder*, 450 F.3d at 448. That requirement is satisfied here. The SAC describes what "[v]ideo footage of the incident shows" (Doc. 15 ¶ 37) and both sides agree that the proffered BWC footage is, in fact, the "video footage" referenced in the SAC and that the proffered BWC footage is authentic and complete. *Compare Nevarez v. City of Mesa*, 2025 WL 2431799, *4-5 (D. Ariz. 2025) (declining to consider BWC footage when ruling on motion to dismiss, both because "the TAC nowhere refers to the BWC footage" and because the plaintiff asserted that the defendants' proffered exhibits were "incomplete") *with McCormick v. Cnty. of San Diego*, 2021 WL 913906, *3 (S.D. Cal. 2021) ("Plaintiff's lack of opposition, combined with her reference and at least partial reliance on the recording in the FAC, are sufficient grounds for the court to consider the recording in deciding the County's motion to dismiss under Rule 12(b)(6).").

Thus, the Court will consider Officer Gastelum's BWC, Officer Snider's BWC, and Officer Snider's Second BWC when resolving the motion to dismiss.[6] And "because [Plaintiff] has never contended that the video footage is inaccurate or unreliable, [the Court] view[s] the facts in the light depicted by the videotape, although [the Court] construe[s] any ambiguities in the video footage in the light most favorable to [Plaintiff]." *Mayfield v. City of Mesa*, 131 F.4th 1100, 1104 (9th Cir. 2025). (cleaned up). *Cf. Hernandez v. Town of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021) ("[W]e do not accept a

---

[6] As for transcripts submitted by Plaintiff, it is unnecessary to decide whether they may independently be considered under the incorporation-by-reference doctrine because the BWC footage itself contains the relevant audio passages.

- 9 -

non-movant's version of events when it is clearly contradicted by a video in the record.") (cleaned up).

### III.     Count One

In Count One, Plaintiff alleges that the Defendant Officers violated her Fourth Amendment rights both by using excessive force and by subjecting her to an unlawful seizure.  (Doc. 15 ¶ 64.)

#### A.     **Excessive Force**

##### 1.     The Parties' Arguments

The Defendant Officers' argument is twofold: first, they used a reasonable amount of force (Doc. 17 at 6-8); and second, they are entitled to qualified immunity (*id.* at 10-13). As for the reasonableness of the force used, the Defendant Officers note that "[a]n excessive force claim in the course of an arrest is analyzed under the Fourth Amendment's 'objective reasonableness' standard" and model their arguments off the factors in *Graham v. Connor*, 490 U.S. 386 (1989). (*Id.* at 6.)  First, as for the nature and quality of the intrusion, the Defendant Officers argue that "[t]he amount of force used by Defendant Officers was minimal at most.  It was Plaintiff who flopped herself to the ground. . . . Defendant Officers did not tackle her to the ground, but instead, held her by the arms and gave her an opportunity to comply with their commands."  (*Id.* at 6-7.)  The Defendant Officers argue that when they "told her to turn around, Plaintiff said 'no'" and that "[a]fter getting one handcuff on her, [Defendant Officers] again asked her to put her hand behind her back to which she refused."  (*Id.* at 7.)  The Defendant Officers further argue that "Officer Snider simply straddle[d] Plaintiff's legs while Officer Gastelum held on to her head and arm" and that "[a]fter Defendant Officers were able to get her handcuffed, they quickly got her off the ground and walked her to the patrol vehicle." (*Id.* at 7.)  Second, as for the state's interest in the use of force, the Defendant Officers "concede for the purpose of their Motion to Dismiss the severity of the crime . . . was minor" but argue that "Plaintiff was actively resisting arrest" when they "initially took hold of her arms to place her in handcuffs" because "she intentionally slid from her chair to the ground" and "[a]fter

[Defendant Officers] helped her up, she again dropped her body weight." (*Id.* at 7-8.) The Defendant Officers argue that "Plaintiff repeatedly refused to comply with lawful commands, grabbed Officer Gastelum's pant leg, and concealed her arm beneath her body to prevent officers from securing the handcuffs." (*Id.* at 8.) The Defendant Officers contend that "[b]ecause Plaintiff was actively resisting lawful commands, she posed a legitimate immediate threat to the safety of Defendant Officers." (*Id.*) As for qualified immunity, the Defendant Officers argue that "[i]t would not have been clear to Defendant Officers that the amount of force they used to take Plaintiff into custody was unlawful based on existing Ninth Circuit case law" and cite a series of Ninth Circuit cases in support. (*Id.* at 11-12.)[7] Specifically, the Defendant Officers argue that "when Defendant Officers attempted to place Plaintiff in handcuffs, she actively resisted by dropping her weight to the ground. Contrary to any claim of excessive force, the officers did not tackle her but instead held her by the arms and gave her multiple opportunities to comply. They assisted her off the ground, only for her to drop her weight again. Rather than letting her fall, the officers carefully lowered her." (*Id.* at 12-13.) The Defendant Officers add that they "maintained control using minimal force: Officer Snider straddled her legs while Officer Gastelum secured her head and arm." (*Id.* at 13.)

In response, Plaintiff argues that "[t]he Defendant Officers are not entitled to qualified immunity on the Fourth Amendment excessive force claim." (Doc. 24 at 8.) Also basing her analysis on the *Graham* factors, Plaintiff first argues that she "had not committed any significant crimes." (*Id.* at 9.) Plaintiff next argues that she "posed no immediate threat." (*Id.* at 10.) Specifically, Plaintiff argues that she "did not say or do anything which a reasonable police officer could perceive to be an imminent threat of death or serious physical injury" and that she "never possessed a weapon or verbally threatened anyone." (*Id.*) Plaintiff then argues that she "did not actively resist[] arrest or attempt[] to escape." (*Id.*) Plaintiff also faults the Defendants Officers for analyzing her alleged

---

[7]    The cited cases are *Luchtel v. Hageman*, 623 F.3d 975 (9th Cir. 2010), *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001), and *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994).

resistance "under the moment of threat rule rather than the totality-of-circumstances rule." (*Id.* at 11.)  Plaintiff further argues that "even if [she] resisted arrest, her resistance was more passive than active." (*Id.*)

In reply, the Defendant Officers reiterate their argument that the amount of force used was reasonable.  (Doc. 29 at 3-5.)  The Defendant Officers argue that Plaintiff's contention that "she did not actively resist arrest or attempt to flee" is not "accurate" because "the video clearly shows" that "it was Plaintiff who intentionally flopped to the ground" and "the [Defendant] Officers did not tackle her or allow her to fall." (*Id.* at 4.) The Defendant Officers reiterate their argument that "[i]t was Plaintiff who physically resisted" and that "her active resistance . . . created a threat to their safety." (*Id.*)  The Defendant Officers also argue that "[p]lacing an individual in handcuffs necessarily requires officers to make physical contact and apply some degree of force." (*Id.* at 5.)  The Defendant Officers next argue that "[e]ven assuming, arguendo, that Plaintiff has plausibly alleged . . . that Defendant Officers . . . employed excessive force in effectuating her arrest . . . Plaintiff has nonetheless failed to satisfy her burden of demonstrating that the rights allegedly violated were 'clearly established' at the time of the incident." (*Id.* at 6.) Specifically, the Defendant Officers argue that "Plaintiff has not cited a single case—let alone one with materially similar facts—that would place the alleged constitutional violations 'beyond debate' for a reasonable officer." (*Id.* at 7.)  The Defendant Officers argue that "[i]n contrast, [they] have cited multiple cases in their Motion that support the conclusion that the officers' conduct did not violate clearly established law." (*Id.*)  In sum, the Defendant Officers argue that "[t]he burden rests squarely with Plaintiff to overcome the defense of qualified immunity by identifying precedents that clearly establishes the unconstitutionality of Defendant Officers conduct in the specific context of the case.  Her failure to do so is dispositive." (*Id.*)

    2. <u>Analysis</u>

      a. **Qualified Immunity Two-Step Framework**

"Qualified immunity shields federal and state officials from money damages unless

a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Thus, "[w]hen an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted). "Although [courts] must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, [courts] are also limited to considering what facts the officer could have known at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

When the defense of qualified immunity is raised in a § 1983 action involving a claim of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances." *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014). "In assessing the objective reasonableness of a particular use of force, [courts] consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc) (citation omitted). "To assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Green*, 751 F.3d at 1049 (citations and internal quotation marks omitted). "Because this inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth

Amendment should only be taken from the jury in rare cases." *Id.* (citation and internal quotation marks omitted). With that said, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

For purposes of the second step's "clearly established" inquiry, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (cleaned up); *West v. City of Caldwell*, 931 F.3d 978, 983 (9th Cir. 2019) ("[W]e must locate a controlling case that squarely governs the specific facts at issue, except in the rare obvious case in which a general legal principle makes the unlawfulness of the officer's conduct clear despite a lack of precedent addressing similar circumstances.") (cleaned up). On the other hand, "there need not be a case directly on point, or even one with fundamentally similar facts." *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 899 (9th Cir. 2024) (cleaned up). *See generally Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts."); *Scott v. Smith*, 109 F.4th 1215, 1229 (9th Cir. 2024) ("Plaintiff need not identify a factual twin.").

"The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular

- 14 -

conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (cleaned up). *See also Gibson v. City of Portland*, 165 F.4th 1265, 1285 (9th Cir. 2026) ("The burden is on Plaintiffs to show that the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.") (cleaned up). "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citation omitted). *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

### b. **Step One**

#### i. Severity Of The Intrusion

"Characterizing the amount of a non-lethal force can often depend on specific factual circumstances." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021). The SAC alleges that while Plaintiff "was sitting down . . . Officer Gastelum forcefully and unnecessarily grabbed [her] left arm and pulled her to the ground." (Doc. 15 ¶ 28.) The SAC further alleges that the Defendant Officers "tackled Plaintiff to the ground and Officer Snider got on top of Plaintiff" and Officer Snider pressed "his knee into Plaintiff's leg" and "burned Plaintiff's body against the hot concrete for approximately two minutes, before finally placing Plaintiff in handcuffs and allowing her to stand up." (*Id.* ¶ 34, 36, 40.)[8] The SAC also alleges that several bystanders screamed at the Defendant Officers for burning Plaintiff's legs and that Plaintiff herself screamed in pain. (*Id.* ¶ 37-39.) As a result of these actions, the SAC alleges that "Plaintiff suffered several injuries across her body and

---

[8] As noted, the Court may consider the BWC footage but construes any ambiguities in the light most favorable to Plaintiff. *Mayfield*, 131 F.4th at 1104. Upon viewing Officer Gastelum's BWC, the Court is highly skeptical of the SAC's allegations that Plaintiff was "pulled . . . to the ground" or that she was "tackled . . . to the ground." (Doc. 15 ¶¶ 29, 34.) Officer Gastelum's BWC depicts Plaintiff repeatedly pulling/sliding herself to the ground as the Defendant Officers attempt to hold her up and arrest her. (Officer Gastelum's BWC at 6:19-7:05.) Nevertheless, for the reasons discussed elsewhere in this order, the SAC's remaining allegations are still sufficient to state a valid excessive force claim.

legs," including several burns that "were so severe that she had to be admitted to the burn unit of Valleywise Health, where she underwent a 'debridement of the right lower extremity.'" (*Id.* ¶ 44-45.)

"The Fourth Amendment recognizes that the right to make an arrest carries with it the use of some degree of force." *Demarest v. City of Vallejo Cal.*, 2020 WL 803850, *4 (E.D. Cal. 2020), *aff'd*, 44 F.4th 1209 (9th Cir. 2022). Nevertheless, "all force . . . must be justified by the need for the specific level of force employed." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). Here, even assuming that the Defendant Officers' initial efforts to restrain Plaintiff may not have involved a severe intrusion, their subsequent conduct in pressing Plaintiff into the hot pavement for two minutes, causing her to suffer severe burns that required medical treatment, qualifies as a "serious" and "non-trivial"— i.e., "force that is capable of causing death or serious injury," *Hunter v. City of Fed. Way*, 806 F. App'x 518, 520 (9th Cir. 2020)—amount of force. *See, e.g.*, *Crema v. Las Vegas Metro. Police Dep't*, 2023 WL 6262556, *10 (D. Nev. 2023) (holding that the "use of force was not minimal" where the plaintiff was placed on "asphalt for up to ten minutes," "screamed that he was being hurt and burned while on the ground," and was subsequently "transported to University Medical Center for his injuries, including second degree burns to his abdomen, left arm, forehead, and knees"); *Riggs v. City of Anaheim*, 2022 WL 17327319, *6 (C.D. Cal. 2022) ("Here, the use of force was grabbing Riggs by both shoulders and pushing her to the ground, which caused her injury and aggravated her existing condition. While not lethal, the force described and shown on the camera footage demonstrates that this was a non-trivial use of force."); *Jorgensen v. City of Palm Desert*, 2020 WL 7314849, *1 (C.D. Cal. 2020) (finding that "Deputy Defendants used excessive force by restraining or immobilizing Plaintiff against hot asphalt, causing Plaintiff substantial burn injuries").

ii.    The Government's Interest

"Under *Graham*, [courts] evaluate the state's interests at stake by considering '(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to

- 16 -

the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *Rice*, 989 F.3d at 1121 (citation omitted).

As for the first factor, the Defendant Officers "concede for the purpose of their Motion to Dismiss the severity of the crime at the time Defendant Officers arrived on the scene was minor." (Doc. 17 at 7.)

The second and "most important" factor is whether the suspect posed an immediate threat to the safety of the officers or the public. *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023). "[T]here must be objective factors to justify such a concern." *Mattos v. Agarano*, 661 F.3d 433, 441-42 (9th Cir. 2011) (citation omitted). Here, the Defendant Officers argue that "[b]ecause Plaintiff was actively resisting lawful commands, she posed a legitimate and immediate threat to the safety of Defendant Officers." (Doc. 17 at 8.) This argument conflates, in some ways, the second and third factors. Although the third factor deals with whether Plaintiff resisted arrest, the second "consider[s] 'the danger a suspect poses at the time force is applied.'" *Andrews v. City of Henderson*, 35 F.4th 710, 716 (9th Cir. 2022) (citation omitted) (emphasis omitted). Even assuming that Plaintiff refused to cooperate, the Ninth Circuit has found that where "[a plaintiff] refused to cooperate," a reasonable officer would nevertheless know there was no immediate threat when the plaintiff did not "yell or use profanity, attempt to flee or to harm the officers, or reach for any sort of weapon." *Rice*, 989 F.3d at 1122-23. The allegations in the SAC do not suggest, at least when construed in the light most favorable to Plaintiff, that Plaintiff posed an immediate threat and nothing in the BWC footage compels a different conclusion. Plaintiff did not make any aggressive statements to the Defendant Officers, she did not attempt to flee or harm the Defendant Officers, and she did not attempt to reach for any sort of weapon. Even assuming that Plaintiff "[did] not initially comply with [Defendant Officers'] orders," "such minimal resistance is a 'form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officers or others.'" *Houseton v. Kirk*, 2025 WL 636956, *5 (C.D. Cal. 2025) (quoting *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1165 (9th Cir. 2011)).

As for the third factor, Plaintiff was not "actively resisting arrest or attempting to evade arrest by flight.'" *Rice*, 989 F.3d at 1121. At no point did Plaintiff attempt to flee the scene, and the Defendant Officers do not suggest otherwise. Instead, the Defendant Officers argue that Plaintiff "actively resisted" when she, among other things, "refused to comply with lawful commands." (Doc. 17 at 7-8.) This argument is unavailing. Even though, as discussed in footnote eight, the BWC footage clearly depicts various acts of non-compliance by Plaintiff, "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

For related reasons, there is no merit to the Defendant Officers' argument that Plaintiff engaged in active resistance when she "concealed her arm beneath her body to prevent officers from securing the handcuffs" and "forcefully pulled it away in continued resistance." (Doc. 17 at 8.) Where a suspect's resistance "may not have been perfectly passive" but the suspect nevertheless "'physically resisted . . . for only a brief time,'" such a "level of resistance 'would be closer to . . . passive resistance . . . than it would be to truly active resistance.'" *Bowman v. City of San Bernardino*, 2024 WL 5643583, *12 (C.D. Cal. 2024) (quoting *Bryan*, 630 F.3d at 830).[9]

### iii. Balancing The Competing Interests

In light of the analysis concerning the first two factors, the third factor—the balance of interests between the gravity of the intrusion and the Defendant Officers' need for the intrusion—favors Plaintiff. Plaintiff suffered injuries across her body and legs, including burns that required her admission to a burn unit (Doc. 15 at ¶ 44-45), after the Defendant Officers used non-trivial force in pressing her against the hot pavement for two minutes, even as she was screaming in pain and bystanders were raising concerns about the burns. Given the non-severe nature of the alleged crime, the absence of any threat to the Defendant

---

[9] One of the exhibits to the SAC bolsters this conclusion. (Doc. 15-8 [City of Phoenix Municipal Court, Notice of Dismissal].) Plaintiff was charged with "resisting arrest by *passive* resistance" with a "date of violation" listed as "06/01/2024"—the date of the encounter at issue between Plaintiff and the Defendant Officers. (*Id.*, emphasis added).

Officers or the public, and Plaintiff's passive resistance, Plaintiff has done enough to state a valid claim for excessive force. *Cf. LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) ("Considering the facts in the light most favorable to the plaintiff, a jury could decide that Officer Horton's actions violated the Fourth Amendment's prohibition on excessive force. LaLonde admits that he initially resisted arrest . . . [but] if the extent of the injury to LaLonde's back is serious enough, a jury could conclude that Horton used force in excess of what was reasonable, even if LaLonde had been resisting at the time. Also, another factor weighing in LaLonde's favor is the fact that he was being arrested for a relatively minor offense.").

c.    **Step Two**

During the second step of the qualified immunity inquiry, Plaintiff must demonstrate that the Defendant Officers violated a clearly established right. The Ninth Circuit has acknowledged that resolving this issue "at the motion-to-dismiss stage raises special problems for legal decision making" and clarified that "[i]f the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." *Keates v. Koile*, 883 F.3d 1228, 1234-35 (9th Cir. 2018) (cleaned up).

Plaintiff does not specifically attempt, in her response brief, to identify the case(s) that might qualify as the clearly established law sufficient to satisfy the second step. Instead, Plaintiff simply addresses the first step, i.e., whether the use of force should be considered excessive under the *Graham* factors. (Doc. 24 at 8-12.) This approach is unfortunate because "[t]he burden is on Plaintiffs to show that the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Gibson*, 165 F.4th at 1285 (cleaned up).

Even so, the Court's review of the relevant caselaw suggests that Plaintiff has done enough to avoid dismissal at the pleading stage. The SAC alleges that the Defendant Officers used excessive force by pressing Plaintiff against the hot pavement for two minutes after taking her to the ground, even as she was screaming in pain and not actively

- 19 -

resisting and even as bystanders were informing the Defendant Officers that they were burning her legs.  As of June 2024, a number of courts had concluded that similar conduct constitutes excessive force.  For example, in 2009, the Eighth Circuit affirmed the denial of qualified immunity where officers took the unarmed plaintiff to the ground and continued holding him down even though he "was not attempting to flee, resist, or harm the Officers" and was "complaining that the asphalt was burning his exposed skin." *Howard v. Kansas City Police Dept.*, 570 F.3d 984, 989-90 (8th Cir. 2009).  "Given [the plaintiff's] persistent, specific complaints about the exposure of his exposed skin to hot asphalt on a day when the temperature exceeded 100 degrees, a reasonable officer should have recognized the danger to [the plaintiff] and responded appropriately.  Instead, Officers Bronner and Sartain did nothing for four to six minutes except pin [the plaintiff's] arms and legs to the ground in spite of his attempts to move his exposed skin off the asphalt.  On this version of the facts, we conclude the Officers' actions were not objectively reasonable." *Id.* at 990.

Next, in *Simpson v. City of Mesa*, 2014 WL 12689878 (D. Ariz. 2014), the district court held that "even though [plaintiff] ha[d] stated a claim for excessive force relating to the take-down on hot pavement, he ha[d] not met his burden of showing that the right against this type of force was clearly established." *Id.* at *8.  In 2016, the Ninth Circuit reversed in part, holding that "it was clearly established that the Fourth Amendment prohibits the continued use of force against an arrestee who is restrained and no longer resisting, and that ignoring an arrestee's complaints of pain violates the Fourth Amendment." *Managed Protective Servs., Inc. v. City of Mesa, Arizona*, 654 F. App'x 276, 277 (9th Cir. 2016).

Finally, after *Managed Protective Services* was decided but before the time of this incident in June 2024, at least two district courts in the Ninth Circuit also declined to dismiss excessive force claims arising under similar facts.  In 2020, a court in the Central District of California denied a motion to dismiss where the complaint alleged that "the Deputy Defendants used excessive force by restraining or immobilizing Plaintiff against

hot asphalt, causing Plaintiff substantial burn injuries," concluding that "the allegations are sufficient to state claim under the Fourth Amendment." *Jorgensen*, 2020 WL 7314849 at *1. And in 2023, a court in the District of Nevada denied the officer defendants' request for qualified immunity at the summary judgment stage of an excessive force case, concluding that "the officers violated Plaintiff's Fourth Amendment right by using excessive force against him after they arrested him, threw him onto the hot asphalt outside the Lowe's store, and had him lying there for up to ten minutes, even though he was already handcuffed, passive and was communicating that he was in extreme pain." *Crema*, 2023 WL 6262556 at *13.

The Court acknowledges that Ninth Circuit law does not definitively resolve whether the above-cited cases qualify as the sort of "controlling law" necessary to satisfy the second prong of the qualified immunity analysis. First, there are some factual differences between this case and the above-cited cases, such as the length of time the plaintiff was pinned against the hot pavement, whether the plaintiff was already handcuffed at the time of the pinning, and the specific level of the plaintiff's resistance (passive or otherwise). On the one hand, the Ninth Circuit has clarified that "there need not be a case directly on point, or even one with fundamentally similar facts." *Chinaryan*, 113 F.4th at 899 (cleaned up). Thus, "Plaintiff need not identify a factual twin." *Scott*, 109 F.4th at 1229. On the other hand, the general rule is that the plaintiff "must locate a controlling case that squarely governs the specific facts at issue." *West*, 931 F.3d at 983. Put another way, the prior case must have arisen "in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117. Given these dueling lines of authority, it can be difficult to determine just how factually similar a prior case must be before it suffices under the second prong of the qualified immunity analysis.

Second, a further complication is that none of the above-cited authorities is a published Supreme Court or Ninth Circuit opinion. To suffice in this context, the prior precedent "must be clearly established by controlling authority or a robust consensus of

- 21 -

cases of persuasive authority." *Tuuamalemalo*, 946 F.3d at 477. The first option—"controlling authority"—is not satisfied here, and it is an open question whether one published out-of-circuit opinion, one unpublished within-circuit decision, and two additional within-circuit district court decisions constitutes a "robust consensus."

In the Court's view, the thumb on the scale that compels these difficult issues to be resolved in Plaintiff's favor is *Managed Protective Services*. True, *Managed Protective Services* is unpublished, so it is not binding here, and it was not unanimous—in dissent, Judge Bea took issue with the majority's qualified immunity analysis. *Managed Protective Servs., Inc.*, 654 F. App'x at 277-78 (Bea, J., dissenting). Nevertheless, it is notable that the Ninth Circuit previously reversed a district court in the District of Arizona for doing exactly what the Defendant Officers ask the Court to do here—dismiss, on qualified immunity grounds, an excessive force claim premised on allegations that officers continued pressing the plaintiff onto hot pavement, causing burns that required medical attention, even as the plaintiff was not actively resisting arrest and complaining of pain.

To the extent it is permissible to look outside the "hot pavement" context during the second step of the qualified immunity analysis,[10] the relevant cases further support the denial of qualified immunity at this early stage of the case. It is clearly established in the Ninth Circuit that individuals have a right to be "free from the application of non-trivial force for engaging in mere passive resistance." *Rice*, 989 F.3d at 1126 (citing *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013)). This right "was clearly established before December 2011." *Id.* at 1127. As discussed above, when the SAC and the BWC footage are construed in the light most favorable to Plaintiff, Plaintiff was engaged in passive resistance and was subjected to non-trivial force by the Defendant Officers.

---

[10] The majority in *Managed Protective Services* held that "the district court erred in examining solely 'hot pavement' cases to determine whether the law was clearly established." 654 F. App'x at 277. Judge Bea took issue with this approach in dissent. *Id.* at 277-28 (Bea, J., dissenting) ("The district court did not err when it canvassed other hot surface cases to determine whether the officers' conduct here amounted to a clearly established violation of Simpson's constitutional right to be free from unreasonable seizure.").

Notwithstanding all of this, the Defendant Officers argue that in light of *Luchtel*, *Arpin*, and *Forrester*, "[i]t would not have been clear to Defendant Officers that the amount of force they used to take Plaintiff into custody was unlawful." (Doc. 17 at 12.) This argument is unavailing. In *Luchtel*, the Ninth Circuit held that "the officers' use of force in arresting and detaining" a plaintiff was "reasonable" where the plaintiff posed an immediate threat to the safety of officers or others because she was "under the influence of crack cocaine," "hiding with her child under a car," "threat[ening] suicide," "declar[ing] that the officers were . . . assassins trying to kill her," and "pulling her [67-year old neighbor] to the floor" for protection. 623 F.3d at 980-81. Also, "the evidence [was] undisputed that Luchtel was actively resisting arrest." *Id.* at 981. In contrast, Plaintiff was not a threat to the Defendant Officers or others and was not actively resisting arrest. In *Arpin*, the Ninth Circuit held that the officer's use of force was reasonable when the plaintiff "stiffened her arm and attempted to pull free" during a handcuffing attempt, the officer "used physical force to handcuff [her]," and she was "handcuffed without injury." 261 F.3d at 921-22. In contrast, Plaintiff was not left without injury but suffered severe burns that required medical attention. Finally, in *Forrester*, the Ninth Circuit affirmed a "jury's conclusion that the officers acted reasonably" in an excessive force suit involving arrestees who "were part of a group of more than 100 protesters operating in an organized and concerted effort to invade private property, obstruct business, and hinder law enforcement," causing officers to be "justifiably concerned about the risk of injury to the medical staff, patients of the clinic, and other protesters." 25 F.3d at 804. Once again, those are not the facts here.

Accordingly, the Defendant Officers are not entitled to qualified immunity at this stage of the case as to Plaintiff's excessive force claim.

### B.    Unlawful Seizure And False Arrest

#### 1.    The Parties' Arguments

The Defendant Officers argue that "[t]he existence of probable cause defeats Plaintiff's Fourth Amendment illegal seizure and false arrest claims." (Doc. 17 at 8.)

Specifically, the Defendant Officers argue that they had probable cause to arrest Plaintiff for disorderly conduct under A.R.S. § 13-2904(A)(1) & (2) and/or for resisting arrest under A.R.S. § 13-2508(A)(3). (*Id.* at 9-10.) The Defendant Officers contend that they "were dispatched to the residence in response to a 911 call reporting a disturbance involving a 'heavyset Hispanic female in a black shirt actively swinging on another female in the front yard.'" (*Id.* at 10, citing Officer Snider's BWC.) The Defendant Officers argue that when they "first arrived, Plaintiff was hysterical and explained that she had been having an argument and was yelling at her brother" and that "Officer Snider was informed prior to taking Plaintiff into custody that Plaintiff was intoxicated and was fighting with her mother." (*Id.*, citing Officer Gastelum's BWC & Officer Snider's BWC.) The Defendant Officers further argue that when they "attempted to take [Plaintiff] into custody, she resisted arrest, giving Defendant Officers another independent basis to arrest her." (*Id.*) The Defendant Officers argue that "[a]t a minimum, Defendant Officers had arguable probable cause to arrest Plaintiff for disorderly conduct and resisting arrest" because they "responded to the scene following a 911 call" and "[u]pon arrival . . . learned that Plaintiff had been involved in an altercation with family members prior to their arrival." (*Id.*) The Defendant Officers also argue that Plaintiff "engaged in conduct consistent with resisting arrest." (*Id.* at 14.)

In response, Plaintiff argues that "[a] warrantless arrest is only reasonable under the Fourth Amendment if the arresting officer has probable cause to believe that a criminal offense has been or is being committed" and that the Defendant Officers had "no probable cause for detaining and arresting [her]." (Doc. 24 at 3, 7.)[11] Plaintiff argues that when "Officer Gastelum arrived on scene and questioned [Plaintiff]," "[s]he told Officer Gastelum that she was arguing with her brother regarding a misunderstanding in the past,

---

[11]    Plaintiff initially argues that the Defendant Officers had "no probable cause for detaining Alizy Zabala." (Doc. 24 at 1-3.) Plaintiff also argues that "[e]very reasonable person, let alone officer, would have realized that what he was doing violated Alizy['s] . . . constitutional rights." (*Id.* at 8.) Alizy Zabala, however, is not a plaintiff in this action, and thus the Court has omitted arguments related to alleged violations of her rights.

but nothing physical happened." (*Id.*, citing Officer Gastelum's BWC at 4:20-5:02.) Plaintiff argues that "[a]s [she] was trying to explain what happened, Officer Gastelum marched up to [her] and without a word, grabbed [her] arm." (*Id.*, citing Officer Gastelum's BWC at 6:18-9:00.) Plaintiff further argues that "[e]ven though [she] never threatened or attempted to strike the [Defendant Officers], they began to detain [her] and attempt to place handcuffs on her wrists, without advising her that she was under arrest or even stating the reason for the arrest." (*Id.*) Plaintiff concludes that "[e]very reasonable person, let alone officer, would have realized that what [Defendant Officers] [were] doing violated . . . [her] constitutional rights." (*Id.* at 8.)

In reply, the Defendant Officers once again argue that they "had probable cause to arrest Plaintiff under A.R.S. § 13-2904" and that "Plaintiff's own response concedes that officers arrived at the scene with specific information from a 911 caller—namely, that a 'concerned neighbor had reported that a heavy-set Hispanic female or male wearing a black shirt was actively swinging on another female in the front yard.'" (Doc. 29 at 3, quoting Doc. 24 at 2.) The Defendant Officers argue that "[t]his report alone provided officers with a reasonable basis to believe that a physical altercation had occurred in public view." (*Id.*) The Defendant Officers also argue that Plaintiff "acknowledges that her niece . . . informed officers that her cousin . . . was attempting to separate Plaintiff by escorting her to her bedroom" and that Plaintiff "admits that she told Officer Gastelum she had been arguing with her brother." (*Id.*) In short, the Defendant Officers argue that "[g]iven the totality of the circumstances—an eyewitness report of a physical altercation, corroborating statements from individuals on scene, and Plaintiff's own admission of an argument—a reasonable officer could readily conclude that probable cause existed to arrest Plaintiff for disorderly conduct." (*Id.*) The Defendant Officers also argue that Plaintiff has "failed to satisfy her burden of demonstrating that the rights allegedly violated were 'clearly established' at the time of the incident." (*Id.* at 6.)

2.    Analysis

It is well established that "an arrest without probable cause violates the Fourth

Amendment and gives rise to a claim for damages under § 1983." *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988). But an officer who makes an arrest without probable cause may still be entitled to qualified immunity if he reasonably believed there was probable cause. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009). Therefore, when addressing an unlawful arrest claim, "the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is reasonably arguable that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Smith v. City of Payson*, 2012 WL 12881975, *4 (D. Ariz. 2012) (citation omitted). *See also C.L. by & through Leibel v. Grossman*, 798 F. App'x 1015, 1016 (9th Cir. 2020) ("In analyzing qualified immunity, the question with respect to whether an unlawful arrest violated clearly established law is whether it is *reasonably arguable* that there was probable cause for arrest.") (cleaned up).

"Probable cause exists when the police know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) (cleaned up). "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008). When determining whether probable cause exists, the Court "looks to the totality of the circumstances known to the arresting officer" at the time of the arrest. *Id.* (internal quotation mark omitted). "In applying these standards, [the Court] must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest." *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975). "Probable cause 'is not a high bar.'" *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (citation omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal

activity, not an actual showing of such activity." *Id.* (cleaned up).  Where any potential crime is supported by probable cause, the arrest is justified.  *Barry v. Fowler*, 902 F.2d 770, 773 n.5 (9th Cir. 1990).

The Defendant Officers contend that the facts, "viewed objectively, provided [them] with at least arguable probable cause to believe that Plaintiff had" committed the crime of disorderly conduct.  (Doc. 17 at 9, 12-13.)[12]  The Defendant Officers are correct.  Under Arizona law, "[a] person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person: (1) Engages in fighting, violent or seriously disruptive behavior; or (2) Makes unreasonable noise . . . ."  A.R.S. § 13-2904(A)(1)-(2).  The SAC alleges that "[a]t approximately 1:00 p.m. on June 1, 2024, [the Defendant Officers] arrived at the residence of a neighborhood in connection with, 'a verbal argument.'"  (Doc. 15 ¶ 16.)  Officer Gastelum's BWC portrays him arriving at the residence, where he then begins to speak to Plaintiff and asks her "who was involved."  (Officer Gastelum's BWC at 1:40-1:45.)  Plaintiff then, while crying, informs Officer Gastelum that "it's nothing," "a misunderstanding or whatever."  (*Id.* at 1:55-2:04.)  Officer Gastelum then pulls Plaintiff to the side and asks her "who were you arguing with?," to which Plaintiff responds, "I don't want to say."  (*Id.* at 2:53-3:26.)  Plaintiff then states, "my brother" "nothing happened . . . like we're just arguing."  (*Id.* at 3:42-3:49.)  Officer Gastelum then asks Plaintiff "did he hit you," to which Plaintiff responds, "no he didn't."  (*Id.* at 3:50-3:52.)  Officer Gastelum then asks Plaintiff "what's this on your eye?," to which Plaintiff responds, "it's nothing."  (*Id.* at 3:52-4:03.)  After the Defendant Officers arrest Alizy Zabala, Plaintiff can be heard saying "she didn't do shit" and "it's between me and another person."  (Officer Snider's BWC at 5:20-5:31.)  Following Plaintiff's arrest, Officer Snider explains to a group of individuals that "somebody called 911" to report that a "Hispanic female" and a "heavy-set another

---

[12]     "[B]ecause probable cause need only exist for one, rather than all, of the offenses charged," it is unnecessary to "address whether there was probable cause to arrest" Plaintiff for resisting arrest in violation of A.R.S. § 13-2508. *Miller v. City of Scottsdale*, 88 F.4th 800, 804 n.2 (9th Cir. 2023)

- 27 -

Hispanic female" were "actively swinging on each other." (*Id.* at 10:30-10:55.) Officer Snider then states that he saw "two people matching that description that are clearly not cooperative." (*Id.* at 10:55-11:03.)

In sum, the SAC and the BWC footage reveal that the Defendant Officers received a 911 call that two Hispanic females were engaged in a verbal altercation and actively swinging on each other; the Defendant Officers then arrived at the scene and observed two Hispanic females; and Plaintiff then, more than once, admitted to being an individual involved in an argument.[13]  Under these circumstances, and even drawing all inferences from the SAC and the BWC footage in Plaintiff's favor, the Defendant Officers could have reasonably believed that Plaintiff had committed disorderly conduct. *See, e.g.*, *Caldwell-Parker v. Surprise Police Dep't*, 2022 WL 18110867, *7 (D. Ariz. 2022), *aff'd*, 2024 WL 1596457 (9th Cir. 2024) ("Defendants received information that Plaintiff, in the presence of neighbors and family members, engaged in seriously disruptive behavior in his treatment of Sapp; specifically, yelling at her, pouring water from the water bottle over her head, and spraying her with a water hose.  Thus, Defendants could have reasonably believed Plaintiff committed disorderly conduct [in violation of A.R.S. § 13-2904(A)]."); *Brown v. Guinee*, 2022 WL 877208, *7 (D. Ariz. 2022), *aff'd*, 2023 WL 4422302 (9th Cir. 2023) ("Given the harassing behavior exhibited by Plaintiffs leading up to the altercation and the reports of the witnesses that Brown had started the fight, the officers had probable cause to arrest Brown and Peltz [under A.R.S. § 13-2904(A)] during the short investigation."); *Johnson v. Kaczynski*, 2016 WL 7786474, *4 (D. Ariz. 2016) ("In addition to the facts quoted above from Plaintiff's Complaint, the Report further reflects that [the officers] were called to . . .

---

[13]    Although the record does not contain any information about the identity or reliability of the person who made the 911 call, and "an anonymous tip, without more, does not constitute probable cause," *United States v. Wright*, 215 F.3d 1020, 205 (9th Cir. 2000), the information in the 911 call was not the only information known by the Defendant Officers at the time of the arrest.  After arriving at the scene and before making the arrest, the Defendant Officers obtained additional information—including their observations of the scene and Plaintiff's statements regarding the earlier argument—that tended to corroborate the 911 call.  *United States v. González-Barrera*, 288 F. Supp. 2d 1041, 1051 (D. Ariz. 2003) ("[A]nonymous tips, when corroborated, are sufficient to establish probable cause.") (collecting cases).

address issues the staff encountered with Plaintiff. In the course of their investigation, the officers either directly observed or learned from others present at the scene that Plaintiff was: belligerent, shouting, loud and disruptive, fell to the ground, appeared passed out on a bench, and continually refused any requests to render him aid despite these circumstances. . . . At a minimum, in light of the additional facts reflected in the Report, [the officers] had probable cause to believe that Plaintiff had knowledge of the fact that he was disturbing the peace of individuals . . . due to his 'seriously disruptive behavior' (A.R.S. § 13-2904(A)(1)) or by making 'unreasonable noise' (A.R.S. § 13-2904(A)(2)) in violation of the disorderly conduct statute.").

Plaintiff appears to argue that her seizure was unlawful because the Defendant Officers "did not even tell . . . [her] that she was being arrested and the reasons why prior to detaining or arresting [her]." (Doc. 24 at 8.) But "[w]hile it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, [the Supreme Court has] never held that to be constitutionally required." *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004).

For these reasons, a reasonable officer could have believed probable cause existed at the time of Plaintiff's arrest. The Defendant Officers are thus entitled, at a minimum, to qualified immunity as to Plaintiff's unlawful seizure and false arrest claim.

IV.    Count Two

A.    **The Parties' Arguments**

The City argues that "Plaintiff's *Monell* claim is insufficiently plead." (Doc. 17 at 15.) As an initial matter, the City argues that "Plaintiff cannot hold [the] City liable under *Monell* for the lack of an official policy alone" and that Plaintiff instead "must show existence of a custom" or, alternatively, "a local government's decision not to train certain employees." (*Id.*, citations omitted.) The City then argues that "[r]egardless of whether Plaintiff bases her *Monell* claim on the existence of a widespread and permanent practice or a failure to train, it is insufficiently plead and must be dismissed. The [SAC] identifies only two prior incidents to support this theory. The first, involving Roniah Trotter,

- 29 -

occurred in August 2019—nearly five years before the incident at issue.  The second, involving Ramon Lopez, took place almost four years prior and resulted in Mr. Lopez's death." (*Id.* at 16-17.)  The City argues that "the factual circumstances of these incidents differ significantly from the present case" and that "[c]ourts in the Ninth Circuit have consistently held that such limited and temporally remote incidents are insufficient to establish a municipal custom or practice." (*Id.* at 17.)  Finally, the City argues that "[e]ven if the Court finds that Plaintiff adequately plead her *Monell* claim, the Court must still dismiss it, as for the reasons argued above, Defendants did not violate Plaintiff's constitutional rights." (*Id.*)

In response, Plaintiff argues that the "City is not entitled to dismissal of Plaintiff's *Monell* claim." (Doc. 24 at 12.)  First, Plaintiff argues that the City's "lack of an official policy concerning the pressing and holding of citizens against dangerously hot pavement during known, extreme heat conditions, despite knowing that such situations were substantially likely to occur on a regular basis and that it could have prevented the violation with an appropriate policy, amounts to deliberate indifference to constitutional rights." (*Id.* at 13.)  Plaintiff also argues that the City "has since implemented a policy" addressing the issue. (*Id.* at 12.)  Second, Plaintiff argues that "the Phoenix Police Department provided no training regarding the foreseeable and recurring situation of citizens being brought to the ground and held on the pavement during police encounters in summer months and the potential for citizens to sustain severe burn injuries when held and/or pressed onto hot pavement." (*Id.* at 13.)  Plaintiff argues that "[t]his lack of training is particularly disturbing, given that Phoenix Police Department has caused severe burns to at least two other citizens, including one death, by pressing them against, holding them on, and/or leaving them restrained on pavement during summer months prior to the incident involving [Plaintiff]." (*Id.* at 13-14.)  Separately, Plaintiff argues that the City "failed to train and supervise its police officers regarding proper interactions and handling of subjects who are emotionally disturbed or distressed."  (*Id.* at 14.)  Third, as for "widespread unconstitutional custom or usage," Plaintiff argues that "[t]he incident with [Plaintiff] on

June 1, 2024, was not the first time City of Phoenix police officers caused severe burns to [an] individual by holding them on scalding hot pavement during extreme summer head." (*Id.* at 15.) Plaintiff points to the two incidents outlined in the SAC taking place on "August 20, 2019" and "August 4, 2020." (*Id.*) Plaintiff argues that, under *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), "a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis . . . and the municipality's failure to address the pattern of violations is 'tacit authorization' of the unconstitutional practices." (*Id.*) Plaintiff also argues that "a municipality may be liable for a 'single violation of federal rights' when it is accompanied by a showing that the municipality has 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation. . . .'" (*Id.*, quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).) Plaintiff asserts that "[i]n this case, Phoenix Police Department's practice of ignoring the dangers of hot pavement by placing and holding citizens on it and disregard for clearly established Ninth Circuit law resulted in unnecessary injuries to Plaintiff." (*Id.* at 15-16.)

In reply, the City reiterates its argument that "Plaintiff's *Monell* claim is insufficiently pled and should be dismissed." (Doc. 29 at 7.) The City also argues that "Plaintiff's reliance on *Bd. Of Cnty. Comm'rs* is misplaced" because "the Supreme Court did not expand *City of Canton* to support the proposition that a single incident, standing alone, can establish *Monell* liability. Rather, the Court '*hypothesized* that in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" (*Id.* at 8-9.) The City argues that "[t]his narrow exception does not apply here." (*Id.* at 9.)

### B.    **Analysis**

#### 1.    Policy, Practice, Or Custom

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). A "person" includes local government entities. *Monell*, 436 U.S. at 690. However, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Instead, "municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019) (citation omitted).

The City argues that Plaintiff cannot hold it liable "under *Monell* for the lack of an official policy alone." (Doc. 17 at 15.) The City is mistaken. The Ninth Circuit "consistently has found that a county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006). Nevertheless, under a lack-of-policy theory, "Plaintiff must demonstrate that the City . . . was on notice that the lack of the policies 'would likely result in a constitutional violation.'" *Guy v. Lorenzen*, 547 F. Supp. 3d 927, 948 (S.D. Cal. 2021) (citation omitted). "Merely identifying the lack of a policy in a certain area, on its own, is not enough to show deliberate indifference, and neither is simply invoking deliberate indifference in a conclusory manner." *Id.*

The SAC fails to allege sufficient facts to support *Monell* liability under a lack-of-policy theory or a custom theory. The SAC alleges that (1) "[i]n the years prior to Plaintiff's prior injuries, Phoenix police officers were involved in multiple use-of-force incidents that resulted in burns from dangerously hot pavement"; and (2) "there are numerous additional instances of Phoenix Police officers engaging in excessive force involving pressing and/or holding citizens onto dangerously hot pavement that are not public record or accessible to the public outside of litigation." (Doc. 15 ¶¶ 96-97.) The problem with the latter allegation is that it is conclusory. Although *Monell* claims may have been subject to a lesser pleading standard before *Iqbal* and *Twombly* were decided, it

is now well established in the Ninth Circuit that a plaintiff seeking to assert such a claim must allege facts that would support liability. *See, e.g.*, *A.E. ex rel. Hernandez v. City of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) ("[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. This standard applies to *Monell* claims . . . .") (citations omitted); *Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011) ("Dougherty's *Monell* . . . claims lack any factual allegations that would separate them from the 'formulaic recitation of a cause of action's elements' deemed insufficient by *Twombly* . . . . The Complaint lacked any factual allegations regarding key elements of the *Monell* claims, or, more specifically, any facts demonstrating that his constitutional deprivation was the result of a custom or practice of the City of Covina or that the custom or practice was the 'moving force' behind his constitutional deprivation.") (cleaned up). *See also Hyer v. City & Cnty. of Honolulu*, 2020 WL 7038953, *6 (D. Hawaii 2020) ("Prior to 2009, the Ninth Circuit . . . regularly held that a claim of municipal liability under Section 1983 was sufficient to withstand a motion to dismiss based on nothing more than bare allegations of an unconstitutional policy, practice, or custom. The low pleading threshold was rejected by the United States Supreme Court in [*Iqbal*]. . . . Since *Iqbal*, courts in the Ninth Circuit have repeatedly rejected *Monell* claims based on conclusory allegations that lack factual content from which one could plausibly infer municipal liability.") (citations omitted). The SAC asserts in conclusory fashion that there exist "numerous" additional incidents of excessive force but does not actually identify any additional incidents beyond the two discussed below (which, as later explained, are insufficient on their own). "This approach makes it impossible to evaluate whether the unspecified incidents discussed in the unspecified cases . . . were factually similar to the incident in this case, such that they could plausibly be viewed as indicative of a policy, pattern, or custom that was the moving force behind Plaintiff's

injury." *Ames v. City of Tempe*, 2021 WL 5578868, *3 (D. Ariz. 2021). *See also Blanchard v. City of Los Angeles*, 2021 WL 871997, *3 (C.D. Cal. 2021) ("While the FAC cites to numerous instances, reports, and cases concerning excessive force and others that may have indicated a tendency to employ excessive force by Sheriff's Deputies, these do not rise [to] the required level of specificity for *Monell* claims.").

As for the former allegation, the SAC only identifies two specific incidents—the August 20, 2019 encounter, and the August 4, 2020 encounter —involving Phoenix Police and the use of force on hot pavement. But "two incidents are insufficient to establish a custom or policy." *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017). *See also Wondie v. King County*, 2023 WL 22058, *3 (W.D. Wash. 2023) ("Typically, one or two instances of prior misconduct cannot demonstrate a widespread custom or policy . . . . And while prior cases of similar conduct may provide some evidence that a practice is so ubiquitous that it amounts to official policy, such cases are less helpful when they do not result in an adjudication of wrongdoing."); *Wettstein v. City of Riverside*, 2020 WL 2199005, *5 (C.D. Cal. 2020) ("While there is no per se rule for the amount of unconstitutional incidents required to establish a custom under *Monell*, one or two incidents ordinarily cannot establish a custom, while more incidents may permit the inference of a custom, taking into account their similarity, their timing, and subsequent actions by the municipality. The Ninth Circuit and district courts within the Ninth Circuit have repeatedly declined to infer a custom of constitutional violations based on two unconstitutional incidents alone.") (cleaned up) (collecting cases). By the same logic, two incidents over the preceding five-year period are insufficient to place a municipality "on notice that the lack of the policies 'would likely result in a constitutional violation.'" *Guy*, 547 F. Supp. 3d at 948 (citation omitted). *See also Doe v. Alhambra School Dist.*, 407 F. App'x 90, 92 (9th Cir. 2010) ("To the extent Doe alleges that the City failed to have a policy prohibiting sexual molestation of students or conduct that might lead to it, there is no evidence that prior similar incidents or persistent constitutional violations had occurred, nor was the Doe incident a 'highly predictable consequence' of failure to train along the lines that Doe

suggests."); *Fernald v. Deschutes Cnty.*, 2026 WL 836385, \*4 (D. Or. 2026) ("Municipal liability based on theories of lack of policy and failure to train both require a plaintiff to allege facts to support a pattern of repeated or knowing constitutional violations sufficient to constitute deliberate indifference.").

### 2.    Failure To Train

Municipal liability may also arise when a local government entity fails to adequately train its employees.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.").  "[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact.  Only then can such a shortcoming be properly thought of as a [municipal] policy or custom that is actionable under § 1983." *Id.* (cleaned up).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (cleaned up).  It arises only if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).  "Thus, when [municipal] policymakers are on actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights," yet "choose to retain that program" despite such awareness, *Monell* liability may arise.  *Connick*, 563 U.S. at 61.

Because failure-to-train liability turns not just on the deficiency of the training program, but on the municipality's deliberate indifference to that deficiency, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62.  After all, "[w]ithout notice that a course of training is deficient in a particular respect,

decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62. Any "less stringent standard of fault for a failure-to-train claim would result in de facto *respondeat superior* liability on municipalities." *Id.* (cleaned up). For these reasons, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

Plaintiff's failure-to-train theory of *Monell* liability fails for essentially the same reasons as Plaintiff's lack-of-policy and custom theories of *Monell* liability. Stripped of its conclusory allegations, the SAC relies on the same two incidents—the August 20, 2019 encounter and the August 4, 2020 encounter—to establish a pattern of similar constitutional violations. But as noted, two incidents are insufficient to establish the requisite pattern. *Connick*, 563 U.S. at 62. *See, e.g.*, *Lake v. City of Vallejo*, 2025 WL 1735543, *18 (E.D. Cal. 2025) ("The court . . . warned plaintiff that he must—at minimum—allege more than two incidents that predate the incident involving plaintiff to be considered plausible notice to defendant City of Vallejo that there was a failure to train.") (cleaned up); *King v. City of Sacramento*, 2022 WL 4472883, *8 (E.D. Cal. 2022) ("[Plaintiff] points only to two incidents, one of which is his own experience, as evidence of the Sacramento Police Department's failure to train its officers. But two unconstitutional incidents—without more—does not prove a policy, custom, or practice exists."); *Bagley v. City of Sunnyvale*, 2017 WL 5068567, *6 (N.D. Cal. 2017) ("Instead of alleging facts specific to the City's training program, the Plaintiff's allegations are limited to individual officers' on-site conduct in no more than three isolated instances, including the one at issue here. Thus, Plaintiff fails to plausibly plead a *Monell* claim.").

As Plaintiff correctly notes, there is a potential exception to this requirement—in limited circumstances, a "municipality may be liable for a 'single violation of federal rights.'" (Doc. 24 at 15.) As the Ninth Circuit recently observed, the Supreme Court "has left open the possibility that 'a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations

presenting an obvious potential for such a violation, could trigger municipal liability.'" *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)).  *See also Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (noting that "in rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality" before concluding that the single-incident exception was inapplicable to the facts of that case); *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 796-97 (9th Cir. 2016) (reversing grant of summary judgment on *Monell* claim in a single-incident liability case where the county "had no policy of obtaining warrants before removing children" and entirely failed "to train its employees on the constitutional limitations of separating parents and children").

The single-incident exception is inapplicable here because this case does not remotely resemble the hypothetical in *City of Canton* involving the wholesale failure to provide use-of-force training to armed officers.  Nor does it resemble *Kirkpatrick*, where a single-incident failure-to-train claim was allowed to proceed because the county entirely failed to train its employees on the constitutional limitations of separating parents and children.  The SAC does not allege that the City entirely fails to provide use-of-force training.  Instead, at most, the SAC alleges that the City fails to provide training as to one particular scenario involving the use of force: "Upon information and belief, at the time of the incident, the Phoenix Police Department provided no training regarding the foreseeable and recurring situation of citizens being brought to the ground and held on the pavement during police encounters in summer months and the potential for citizens to sustain severe burn injuries when held and/or pressed onto hot pavement."  (Doc. 15 ¶ 90.)  This case is thus akin to *Perez v. City of Fresno*, 98 F.4th 919 (9th Cir. 2024), where the Ninth Circuit affirmed the grant of summary judgment on a *Monell* claim arising from the use of deadly force, even though the plaintiffs accused the municipality of failing to provide training as to one particular manifestation of the use of force ("prone-restraint asphyxia"), because it was undisputed that the municipality provided some use-of-force training and "missing is

any evidence pointing to a pattern of excessive-force incidents by untrained officers that resulted in the outcome here—restraint asphyxia." *Perez*, 98 F.4th at 931-32.

Finally, to the extent Plaintiff argues in its response brief that the City "has failed to train and supervise its police officers regarding proper interactions and handling of subjects who are emotionally disturbed or distressed" (Doc. 24 at 14), the SAC fails to provide non-conclusory allegations—or any allegations at all for that matter—of a pattern of similar constitutional violations.

V.    **Leave to Amend**

Plaintiff requests leave to amend in the event of dismissal and "submits, as an offer of proof, the Department of Justice's report, which would provide additional facts to be added to the SAC." (Doc. 24 at 16.) Plaintiff argues that the "DOJ's extensive and thorough investigation over the course of nearly three years culminated with a formal report of its findings on June 13, 2024. This Report documents a pattern of rampant, unconstitutional uses of force, based upon numerous instances of officers using unreasonable, excessive force against individuals." (*Id.*) Defendants oppose this request and argue that "[i]t would be futile for Plaintiff to amend her [SAC], because . . . Plaintiff failed to carry her burden to overcome Defendants' affirmative defense of qualified immunity." (Doc. 29 at 9.) Defendants also argue that amendment "would cause undue delay" because "[a]s part of their LRCiv 12.1(c) notice, Defendants specifically advised Plaintiff that her *Monell* claim was deficient." (*Id.* at 9-10.) Further, Defendants argue that "Plaintiff offers no explanation as to why this report . . . was not included in her operative pleading, particularly given that it predates the filing of the [SAC]." (*Id.* at 11.)

Plaintiff's amendment request is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, Plaintiff's amendment request should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."

*AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Additionally, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil. Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

The Court agrees with Defendants that leave to amend would be futile as to the unlawful seizure and false arrest component of in Count One. That claim is being dismissed based on qualified immunity, not due to a failure to allege facts with sufficient particularity. But the Court will grant leave to amend as to the *Monell* claim in Count Two. Although Defendants' arguments as to undue delay are not without force—particularly in light of the fact that the report referenced by Plaintiff was available before her filing of the SAC—this order marks the first time the Court has been required to rule on a motion to dismiss. Because leave to amend should be freely given, and this is the first time the Court has evaluated the sufficiency of Plaintiff's claims, the Court will, in its discretion, grant Plaintiff leave to amend as to Count Two.

Accordingly,

**IT IS ORDERED** that:

1.     Defendants' motion to dismiss (Doc. 17) is **granted in part and denied in part**, as set forth above.

2.     Plaintiff may file a Third Amended Complaint ("TAC") within 14 days of the issuance of this order. Any changes shall be limited to attempting to rectify the deficiencies identified in this order as to Count Two. Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

Dated this 13th day of July, 2026.

Dominic W. Lanza
United States District Judge